# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> GEORGIA MARIE OLTMANNS, <br><br> Defendant. | No. 09-CR-1016-CJW-MAR <br><br> **MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on May 27, 2020. (Docs. 72 & 73). On June 1, 2020, the government timely filed a brief in resistance. (Doc. 74). On June 5, 2020, defendant timely filed a reply. (Doc. 78). Oral argument was not requested and is not necessary. *See* LR 7(c). For the following reasons, the Court **denies** defendant's motion.

## II. RELEVANT BACKGROUND

On January 22, 2009, "defendant sold .13 grams of cocaine base for $100" to a confidential informant ("CI"). (Doc. 37, at 6). On January 23, 2009, "defendant sold .15 grams of cocaine base for $100 to a CI." (*Id.*). On December 12, 2009, a third party told officers that, between August and October of 2008, "he purchased $100 quantities of crack cocaine from the defendant at least 40 times." (*Id.*, at 7). As a result of these transactions and statements, defendant was ultimately held accountable for 5.48 grams of cocaine base. (*Id.*).

On September 22, 2009, a grand jury issued an Indictment charging defendant with two counts of distribution of cocaine base in violation of Title 21, United States

Code, Sections 841(a)(1) and 841(b)(1)(C). (Doc. 3). On October 28, 2009, defendant appeared before the Honorable Jon S. Scoles, United States Magistrate Judge, pleaded not guilty, and was detained pending trial. (Doc. 7). On December 8, 2009, defendant changed her plea to guilty on Count 1 of the Indictment pursuant to a plea agreement with the government. (Docs. 23 & 30). On December 23, 2009, the Court accepted defendant's guilty plea. (Doc. 26).

On April 15, 2010, the United States Probation Officer ("USPO") filed defendant's final presentence investigation report ("PSR"). (Doc. 37). Defendant, at that time, was 47 years old and residing in Iowa. (*Id.*, at 2). Defendant had earned her GED. (*Id.*). Defendant reported having a good childhood, although some sexual abuse was present. (*Id.*, at 18). Defendant had been in a nearly two decade-long relationship with Dennis Brown, who was sentenced to life imprisonment for distributing cocaine base near a protected location in 2007. (*Id.*). Defendant had three children with Brown, all of whom were removed from her care in 2005 due to her substance abuse and the youngest of whom was adopted by a friend. (*Id.*). Following her relationship with Brown, defendant was in a relationship with another man who was a user of controlled substances with multiple drug-related arrests. (*Id.*). Defendant's employment history was mixed and sporadic with some employers complimenting her work ethic and others noting she was terminated for selling drugs on the job. (*Id.*, at 20). At the time of sentencing, defendant had no major health issues but did have a substantial history of drug and alcohol abuse. (*Id.*, at 18–19). Defendant's criminal history was significant and included offenses such as loitering for the purpose of prostitution, disturbing the peace by fighting, theft, child endangerment, possession of crack cocaine, operating a motor vehicle without the owner's consent, and possession of drug paraphernalia. (*Id.*, at 10–15). Notably, at ages 30 and 31, defendant was convicted of manufacturing cocaine

2

base, delivering cocaine, delivery of simulated cocaine, and conspiracy to distribute five grams or more of cocaine base near a school. (*Id.*, at 11–12).

On May 12, 2010, the Court sentenced defendant. (Doc. 48). The Court determined defendant was in criminal history category IV and had a total offense level of 31, yielding an advisory guideline range of imprisonment of 188 to 235 months followed by six years to life on supervised release. (Doc. 37, at 22–23). This calculation was due in part to the parties' agreement that defendant was a career offender. (*Id.*, at 5). Defendant did not file any motion to vary or depart downward. (Doc. 48). The Court sentenced defendant to 188 months, the bottom of the advisory guideline range, followed by six years on supervised release. (Doc. 49).

On March 14, 2012, the Court, on its own motion under Title 18, United States Code, Section 3582(c)(2), found defendant was not eligible for a sentence reduction as a result of Guideline Amendment 750. (Doc. 56). On June 29, 2015, the Court again, on its own motion, found defendant was not eligible for a sentencing reduction as a result of Guideline Amendment 782. (Doc. 60). The Bureau of Prisons ("BOP") now lists defendant as residing at the correctional facility in Pekin, Illinois ("FCI Pekin") with a projected release date of June 26, 2023.

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the

defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") discussing compassionate release issued by the United States Sentencing Commission. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the BOP.

4

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A).  *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant.  *See* (*United States v. Burnside*, 6:18-cr-02068-CJW-MAR-1, (Doc. 53, at 6–7) (N.D. Iowa June 18, 2020)) (compiling cases).

## IV.  DISCUSSION

### A.  *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states the court may reduce a defendant's term of imprisonment after the defendant exhausts all their administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  Courts differ as to whether a defendant fulfills the exhaustion requirement after 30 days even if the warden denied the defendant's request within 30 days and the defendant did not administratively appeal the denial. *Compare*, *United States v. Arthaloney*, No. 8:18CR127, 2020 WL 2571171, at *1 n.1, *2 (D. Neb. May 21, 2020), *with United States v. Ingram*, No. 14-303(2) (DWF/BRT), 2020 WL 3104643, at *2 (D. Minn. June 11, 2020).  This Court has held the plain language of Section 3582(c)(1)(A) does not on its face require a defendant to exhaust administrative appeals "following a denial" or qualify the 30 days provision as only applying after "inaction." *See* (*Burnside*, 6:18-cr-02068-CJW-MAR-1, (Doc. 53, at 7–13).  Because there is a "strong presumption that the plain language of the statute expresses congressional intent," this Court found defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request

5

before filing a motion in the courts. *Id.* (quoting *Ardestani v. INS*, 502 U.S. 129, 135 (1991)).

Here, defendant submitted her request for release to FCI Pekin's warden on April 8 or 10, 2020. (Doc. 73-1, at 1).[1] On May 5, 2020, the warden denied defendant's request. (*Id.*, at 3). Defendant did not appeal the warden's denial. On May 27, 2020, defendant filed her Motion for Compassionate Release now before the Court. (Doc. 72). Thus, at a minimum, 47 days elapsed between the time defendant submitted her request to the warden and the time defendant filed her motion here. Thus, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A) due to the lapse of 30 days despite her failure to administratively appeal the warden's denial.

### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because her medical conditions put her at a high risk of severe complications and death if exposed to COVID-19. (Doc. 73, at 9–12). Specifically, defendant argues she suffers from severe obesity with a body mass index ("BMI") of approximately 45,[2] atrial

---

[1] The date section of her application notes April 8, 2020, but the date April 10, 2020, is scribbled in the top-right corner. (Doc. 73-1, at 1). Defendant asserts she submitted her request on April 8, 2020. (Doc. 73, at 2). The Court finds the precise date to be immaterial to its analysis.

[2] The parties cite defendant's BMI of 45.9 taken on February 1, 2019. (Doc. 73-1, at 33). Defendant's height and weight were more recently taken in April 2019. (*Id.*, at 52). On April 16, 2019, defendant was 73 inches tall, or about 6' 1'', consistent with her PSR. (*Id.*); *see also* (Doc. 37, at 2). That same day, her weight was 335 lbs. (Doc. 73-1, at 52). On April 22, 2019, just six days later, her weight is recorded as 363 lbs. (*Id.*). Considering both weights given the discrepancy, her BMI would have been 44.2 and 47.9 respectively. In any event, the parties agree her BMI significantly exceeds 40.

fibrillation on anticoagulation,[3] hypertension, hyperlipidemia,[4] anemia, vitamin D deficiency, and ongoing bronchitis described as probable chronic obstructive pulmonary disease ("COPD").[5] (*Id.*, at 9); *see also* (Doc. 73–1, at 4–6) (summarizing defendant's medical conditions). She argues she is at risk of contracting COVID-19 while incarcerated at FCI Pekin even though there have been no known cases there. (*Id.*, at 12–13). The government argues these grounds are insufficient. (Doc. 74–1, at 9–14).

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific facility, together can constitute an extraordinary and compelling reason for compassionate release. *See* (*Burnside*, 6:18-cr-02068-CJW-MAR-1, (Doc. 53, at 13–15)) (compiling cases). The Centers for Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or

---

[3] "Atrial fibrillation is the most common cardiac arrhythmia and conveys a significant risk of morbidity and mortality due to related stroke and systemic embolism." Dr. Benjamin A. Steinberg, *How I Use Anticoagulation in Atrial Fibrillation*, American Society of Hematology, https://ashpublications.org/blood/article/128/25/2891/35667/ How-I-use-anticoagulation-in-atrial-fibrillation (Dec. 22, 2016).

[4] "Hyperlipidemia means your blood has too many lipids (or fats), such as cholesterol and triglycerides. . . .. This condition increases fatty deposits in arteries and the risk of blockages." *Prevention and Treatment of High Cholesterol*, American Heart Association,- https://www.heart.org/en/health-topics/cholesterol/prevention-and-treatment-of-high-cholesterol-hyperlipidemia.

[5] Defendant has had at least fifteen documented episodes of bronchitis since 2011 which have been attributed to her history of smoking. (Doc. 73–1, at 4) (citation omitted). Medical records regularly describe her condition as consistent with COPD (*id.*, at 49, 62, 64, 110, 112) although she is also noted as not having a history of COPD (*id.*, at 33). "Chronic bronchitis is a type of COPD [which itself] is a group of lung diseases that make it hard to breathe and get worse over time." *Chronic Bronchitis*, MedlinePlus, https://medlineplus.gov/chronicbronchitis.html#:~:text=What%20is%20chronic%20bronchitis%3F,type%20of%20COPD%20is%20emphysema.

7

moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions-/people-at-higher-risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id.*

Defendant appears to fit at least three of the CDC's categories. First, defendant's chronic bronchitis, described as probable COPD, shows she has ongoing respiratory health issues at least to some extent. Second, her atrial fibrillation, hyperlipidemia, anemia, and hypertension all indicate she suffers from a serious heart condition. And third, defendant is severely obese with a BMI in excess of 40. Although defendant is only 57 years old and not yet in the 65-year category, her types of risks—respiratory, cardiac, and obesity—apply to people of all ages. The medical opinion of Dr. David Rosenthal, an assistant professor of medicine at Yale Medical School and the Medical Director of the ShelterOne COVID Respite Unit in New Haven, Connecticut, supports the conclusion that defendant is at an elevated risk as a result of these conditions. (Doc. 73–1, at 4–6). Dr. Rosenthal highlights defendant's age, cardiac and respiratory issues, and severe obesity in concluding defendant "would be deemed high-risk for a poor clinical outcomes and severe illness if she developed COVID-19 illness." (*Id.*).

The Court finds defendant's health concerns are significant. The government contends defendant's health issues are not so severe such that they substantially diminish defendant's ability to care for herself or recover while in prison. (Doc. 74, at 14) (citing USSG §1B1.13 cmt n.1(A)(ii)). As discussed, the Court holds Guideline Section 1B1.13 is a helpful guidepost but not conclusive given recent statutory changes. The government also notes defendant is designated at Care Level 1 based upon her medical history, which

8

is the lowest level of care in the BOP. (*Id.*, at 13). Indeed, Care Level 1 includes inmates under 70 years old and who are "generally healthy," although they may have some limited medical needs due to conditions such as mild asthma, diabetes, hyperlipidemia, and hypertension. *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, BOP, https://www.bop.gov/resources/pdfs/care_level_classification_guide-.pdf, at 2 (May 2019) (hereinafter *Care Level*, BOP). It appears to the Court, however, that this designation was made when defendant entered the BOP ten years ago, at which time she had no major health issues. *See id.*, at 1–2 (noting a "newly-sentenced" inmate's Care Level is assessed around the time of their arrival at their BOP facility and the redesignation process upon changed health care needs); *see also* (Doc. 73-1, at 121) (noting "start" date of July 29, 2010, for the "CARE 1-Mental Health" designation). It appears that more recently, the BOP has redesignated her to Care Level 2. (Doc. 73–1, at 121) (noting a "start" date of November 5, 2018, for the "CARE 2" "Stable, Chronic Care" designation).[6] The BOP describes Care Level 2 inmates as follows:

- Care Level 2 inmates are stable outpatients who require clinician evaluations monthly to every 6 months.
- Their medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring.
- Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time.

*Example conditions: Medication-controlled diabetes, epilepsy, or emphysema.*

*See Care Level*, BOP, at 2.

---

[6] The Court notes, however, that under the heading "Physical and Mental Health Summary," it notes that defendant "is care level 1 mental health and care level 1 stable, chronic care." (Doc. 73-1, at 121). The description "stable, chronic care" is consistent with a care level 2, not a care level 1.

The government also argues defendant's health issues are well-controlled. (Doc. 74, at 15) (citing (Doc. 73–1, at 18–20)). Although the record shows defendant receives some treatment and medical care, they also reflect a significant number of simultaneous health issues which are particularly worrisome in light of COVID-19.

Other district courts have found extraordinary and compelling reasons in similar situations. *See United States v. Delgado*, No. 3:18-cr-17-(VAB)-1, 2020 WL 2464685, at *6 (D. Conn. Apr. 30, 2020) (granting release based on obesity and sleep apnea); *United States v. Dawson*, No. 18-40085-HLT, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting release based on severe obesity alone); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *2 (D. Conn. Apr. 8, 2020) (granting release based on COPD, asthma, and other respiratory illnesses at age 65); *United States v. Gross*, No. 15-cr-769 (AJN), 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (granting release based on the combination of severe obesity, high blood pressure, and sleep apnea). Thus, the Court finds the combination of defendant's medical conditions put her at high-risk during the pandemic.

Defendant's health issues alone, however, are not sufficient. The Court must also evaluate to what extent defendant is at risk of exposure to COVID-19 at her particular BOP facility or within the BOP generally. Currently, there are no cases of COVID-19 at FCI Pekin. *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/. The low risk defendant faces in her own facility at this time weighs against release. Although the BOP's efforts have spared FCI Pekin thus far, COVID-19 has spread throughout other facilities. Despite the BOP's commendable efforts to prevent transmission among

10

Case 2:09-cr-01016-CJW-MAR   Document 79   Filed 06/24/20   Page 10 of 16

its inmates,[7] there is only so much that can be done to stymie the virus. On May 1, 2020, the BOP reported it had tested 2,700 out 146,000 inmates for COVID-19, with 70 percent testing positive. BOP, Twitter, (May 1, 2020, 8:03 AM), https://twitter.com/OfficialFBOP/status/1256207531820662785. On May 29, 2020, the BOP stated a total of 1,577 persons in federal custody and 181 staff had active COVID-19 cases and 3,180 inmates and 413 staff had recovered. BOP, Twitter, (May 29, 2020, 7:27 AM), https://twitter.com/OfficialFBOP/status/1266345514913738752. Thus, COVID-19's spread is simply a reality and not a condemnation of the BOP's efforts.

In recognition of that reality, many courts have granted release based on the spread of COVID-19 throughout BOP facilities generally. *See, e.g.*, *United States v. Ennis*, No. EP-02-CR-1430-PRM-1, 2020 WL 2513109, at *3, 6 (W.D. Tex. May 14, 2020) (releasing the defendant, who was 71 years old and suffering from degenerative spine disease, diabetes, mellitus, hypertension, arthritis, asthma, hypothyroidism, and hyperlipidemia, despite there being no positive COVID-19 cases at the defendant's facility); *United States v. Ginsberg*, No. 14 CR 462, 2020 WL 2494643, at *2 (N.D. Ill. May 14, 2020) (releasing the defendant, who was 56 and had a history of cardiac and respiratory disease, despite there being no positive COVID-19 cases at the defendant's facility); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *4 (E.D. Mich. May 7, 2020) (releasing the defendant, who was 45 years old and suffering from type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea, and asthma, due to concern about the spread of COVID-19 throughout BOP facilities generally); *United States v. Diep Thi Vo*, No. 15-cr-00310-BLF-2, 2020 WL 2300101,

---

[7] The BOP's measures include limiting inmate movement, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms, and modifying operations to maximum social distancing to the extent possible. *BOP Implementing Modified Operations*, BOP, https://www.bop.gov-/coronavirus/covid19_status.jsp.

at *3 (N.D. Cali. May 7, 2020) (releasing the defendant, who was 74 years old and suffering from hyperlipidemia, hypertension, vision issues, and osteoarthritis, due to concern about the spread of COVID-19 throughout BOP facilities generally). These rulings recognize that once the virus enters a given facility, it spreads quickly. *See United States v. Wilson*, No. 14-209-1, 2020 WL 1975082, at *2 (E.D. Penn. Apr. 24, 2020) ("Correctional and detention facilities present unique challenges for control of COVID-19 transmissions among incarcerated/detained persons . . . [because they] are at special risk of infection, given their living situations, and may also be less able to participate in proactive measures to keep themselves safe[.]") (internal quotation marks, citations, and original alterations omitted); *United States v. Park*, No. 16-cr-473 (RA), 2020 WL 1970603, at *2 (S.D.N.Y. Apr. 24, 2020) ("The nature of prisons—crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products—put those incarcerated inside a facility with an outbreak at heightened risk.").

Although the current absence of COVID-19 at defendant's facility significantly diminishes her risk, the Court cannot ignore the likelihood of the virus's spread and the severe consequences defendant could face due to her multiple vulnerabilities. Although the Court acknowledges COVID-19 is present in every county in the Iowa, the conditions of incarceration inherently limit social distancing measures and create a greater risk of exposure. Defendant is unquestionably safer in a home with few people than in a facility with hundreds of people which has a substantially higher potential of exposure and rapid transmission.

The Court has carefully considered the severity of the risk this defendant faces against the likelihood of her exposure to COVID-19. Given her medical conditions, she would be in greater jeopardy in the probable event of a COVID-19 flare-up at FCI Pekin than the average inmate. Thus, although this is a borderline case, the Court finds the

combination of defendant's medical conditions and the status of COVID-19 in the BOP generally present an extraordinary and compelling reason that could warrant early release.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant's underlying offense is somewhat unremarkable. It reflects only that defendant was a small-time, if repeat, cocaine dealer. The only thing remarkable about her offense conduct was that she repeatedly sold crack cocaine while serving terms of probation on two state offenses.

Defendant's recidivist criminal history and status as a career offender are the truly aggravating factors. In 1993, defendant was convicted of three felony drug offenses involving manufacturing and delivering cocaine; and received a ten-year suspended sentence. (Doc. 37, at 11). In 1994, just one year later, the Court revoked her probation and imposed her suspended sentence for, among other things, distributing cocaine and testing positive for cocaine. (*Id.*). Presumably, that same conduct was the basis for

13

defendant's 1994 conviction for conspiracy to distribute cocaine near a school.[8] (*Id.*, at 12). Defendant was released in 2000 and discharged from supervision in 2004. (*Id.*). In 2005, the Iowa Department of Human Services ("IDHS") received a report that defendant and Brown, the father of her children, sold cocaine in the presence of their children. IDHS removed defendant's children from her home after the children's hair tested positive for cocaine. Defendant was ultimately convicted of child endangerment for this conduct. (*Id.*, at 13). In 2007, defendant was convicted of possessing cocaine. (*Id.*). In 2008, defendant was found in possession of two crack pipes. (*Id.*, at 15). Defendant's history also has no shortage of other criminal conduct not explicitly related to cocaine. By the Court's count, defendant committed seven offenses while on probation, and committed the instant federal offense while serving two terms of probation. (*Id.*). This recidivist criminal history colors her unremarkable underlying offense as the latest offense arising from an undeterred pattern of criminal conduct likely fueled by her cocaine addiction,[9] even after Brown's life imprisonment for distributing cocaine and the seizure of her children. Mitigating though is defendant's diagnosis of cocaine dependence. (*Id.*, at 19). It also appears she performed well under federal supervision from 2000 to 2004, indicating she is perhaps capable of controlling her addiction when motivated to do so. (*Id.*, at 12) ("[D]efendant followed the conditions of her supervised release.").

Defendant's personal characteristics are mixed. Although her history is replete with undeterred criminal conduct, it also reflects she was sexually abused as a child and

---

[8] The PSR states defendant was dealing cocaine out of her residence which happened to be near a school. (Doc. 37, at 12). Thus, it appears defendant was not particularly targeting the school.

[9] Defendant's PSR notes that during the two-year period immediately preceding her arrest on federal charges, she was using about $1,000 worth of cocaine daily. (Doc. 37, at 19).

14

cycled through romantic partners as an adult who were also drug-addicted and prone to criminal behavior. While in prison, defendant has worked in food service and had no disciplinary problems. (Doc. 73–1, at 120–21).

If released, defendant intends to reside with her daughter N.O. and N.O.'s three small children.[10] (*Id.*, at 124). N.O. has no felony convictions. Living with N.O. could provide defendant with some stability and defendant would have access to free mental health and medical services in the area. (*Id.*).

Prior to her instant incarceration, it appears the most time defendant spent in prison was around six years for her first federal felony drug offense. (Doc. 37, at 11–12). Unfortunately, that sentence did not deter her from committing another federal felony drug offense. At the time of this writing, defendant has been imprisoned for approximately ten years and eight months, or about 68 percent of her original sentence before adjusting for good time credit she has received.

Weighing all the factors under Title 18, United States Code, Section 3553(a), the Court finds compassionate release is inappropriate and therefore denies defendant's motion. Although defendant faces greater danger than the average inmate from the COVID-19 pandemic, and although that danger could likely be mitigated if the Court released her early from prison, defendant's lifetime pattern of criminal conduct, and her serial commission of new crimes while on probation, make her a danger to the community such that the Court finds early release unjustified.

---

[10] It speaks volumes about N.O.'s character that she would assist her mother upon release despite her apparently tumultuous upbringing.

15

## V. CONCLUSION

For these reasons, defendant's Motion for Compassionate Release (Doc. 72) is **denied**.

**IT IS SO ORDERED** this 24th day of June, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa